NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-808

GAIL FORD

VERSUS

MARK GARBER, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20194454
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

**********

**CANDYCE G. PERRET**
**JUDGE**

**********

Court composed of Candyce G. Perret, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**G. Karl Bernard**
**Karl Bernard Law, LLC**
**1615 Poydras Sreet, Suite 101**
**New Orleans, LA 70112**
**(504) 412-9953**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Gail Ford**

**Lawrence E. Marino**
**Cearley W. Fontenot**
**Daniel J. Phillips**
**Oats & Marino**
**100 E. Vermilion Street, Suite 400**
**Lafayette, LA 70501**
**(337) 233-1100**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Mark Garber, in his official capacity as the Sheriff of Lafayette Parish**
    **Freddie Laque, in his official capacity as Lieutenant Sheriff of Lafayette Parish**

**PERRET, Judge.**

In this employment discrimination and retaliation case, Gail Ford ("Plaintiff") appeals a trial court's judgment that granted summary judgment in favor of Mark Garber, in his official capacity as the Sheriff of Lafayette Parish, and Freddie Laque, in his official capacity as Lieutenant Sheriff of Lafayette Parish (collectively, "the Defendants"), which dismissed her retaliation claims pursuant to Title VII of the Civil Rights Act of 1964.[1]  For the following reasons, we affirm.

**PROCEDURAL HISTORY AND FACTS:**

On December 5, 2005, the Lafayette Parish Sheriff's Office ("LPSO") hired Plaintiff to work as a Correctional Officer.  According to the petition, in January 2015, Plaintiff was "reassigned as a bailiff for the 15th Judicial District Courthouse" and was "responsible for enforcing court rules, maintaining order, providing security, safely guiding inmates in and out of the court, and announcing the Judges' arrival and departure from the courtrooms."  Plaintiff's employment with LPSO was terminated on September 13, 2017.

On July 22, 2019, Plaintiff filed suit against the Defendants asserting that they "without lawful reason, explanation or justification, discriminated against [her] on the basis of her sex[,]" and that they also "retaliated against [her] by terminating her employment because she filed grievances involving her discriminatory mistreatment by her supervisors and fellow male officers." Specifically, Plaintiff's petition sets forth the following pertinent facts and assertions to allege her discrimination and retaliation claims:

---

[1] On October 3, 2022, Plaintiff filed an opposition to the Defendants' motion for summary judgment wherein she consented to the dismissal of all claims except "her Title VII Retaliation Claim."

10.

On or about May 25, 2017, Ford was advised to report to the office of her immediate supervisor, Lt. [Frederick] Laque. When Ford arrived, Lt. Laque and Paula Fuselier, another bailiff in the 15th JDC, were waiting on Ford in Lt. Laque's office. During the meeting, Officer Fuselier alleged that Ford was "not polite" to her during their interactions in the courthouse. Ford voiced her disagreement with this [sic] Officer Fuslier's assessment of their professional relationship. Officer Fuselier became hostile and combative. Notwithstanding Officer Fuselier's behavior, Ford remained calm and deescalated the situation without incident.

11.

Not long after the meeting, Officer Ford informed Lt. Laque that the interaction made her feel extremely unsafe. Lt. Laque dismissed Ford's concerns. He considered the interaction a harmless "cat fight."

12.

On or about May 26, 2017, Ford submitted a formal grievance regarding Officer Fuselier's conduct during the meeting that occurred on [the] previous day. Officer Ford forwarded the grievance form to Lt. Laque, who was responsible for forwarding grievances up the chain of command.

13.

Lt. Laque, without permission or notice to Officer Ford, amended Officer Ford's grievance form to state that the incident did not take place in his office nor while he was present.

14.

After Officer Ford filed her grievance, Lt. Laque began speaking disparagingly about Officer Ford to her colleagues. He would do so loudly and intentionally while Ford was in earshot.

15.

On or about June 15, 2017, Officer Ford filed a complaint with Defendants' Human Resource Department. Ford's complaint reiterated the incident involving Officer Fuselier but also included the decision made by Lt. Laque to amend her grievance with false and/or misleading statements without her authorization or knowledge.

16.

The following day, Officer Ford met with Major Jules Broussard about her Human Resource complaint. Following their discussion, Major Broussard informed Officer Ford that he would be handling her complaint and her grievance instead of Internal Affairs.

17.

On or about June 26, 2017, Major Broussard formally closed his investigation into Officer Ford's complaint and grievance and concluded that there was no wrongdoing on the part of Officer Fuselier or Lt. Laque.

18.

Officer Ford decided to appeal. Pursuant to the LPSO protocol, Officer Ford requested a three person review panel to review Major Broussard's findings and decision. Not long after Officer Ford made this requests, Major Broussard informed her that her request for a panel review was denied.

19.

Nevertheless, Lt. Laque continued to make Officer Ford's work environment increasingly hostile. He continued to belittle and demean Officer Ford in front of other courthouse employees.

20.

On or about [August 22] 2017, Officer Ford and a fellow bailiff, Officer Devlin Ca'bean[2], were on duty in their assigned courtroom during a criminal court proceeding. The criminal defendant at the hearing, Tony Ben, fled the courtroom after the Judge sentenced him to incarceration for violating probation. Officer Ford and Officer Ca'bean were unable to apprehend Mr. Ben prior to exiting the courtroom. However, the suspect was quickly apprehended in the hallway outside of the courtroom.

21.

On or about August 24, 2017, Lt. Laque called Officer Ford into his office. Lt. Laque demanded that Officer Ford sign a form stating that she willfully and intentionally stood idly by and allowed a criminal defendant escape while on duty. Because Officer Ford and

---

[2] In the petition, Officer Devlin's last name was spelled as "Ca'bean;" however, the record indicates that the proper spelling of his last name is "Cabe'an."

3

her [sic] Officer Ca'bean attempted to apprehend the defendant, she did not sign the document.

## 22.

Because Officer Ford refused to sign the form, Lt. Laque became angry. He pounded his desk with his fist in an effort to intimidate or force Officer Ford to sign the document. In an effort to deescalate the situation, Officer Ford suggested to Lt. Laque that they have a meeting with the judge who was in the courtroom that day. Lt. Laque refused.

## 23.

The next day, Lt. Laque called Officer Ford into his office. Once again he demanded that Officer Ford sign the form stating that she failed to attempt to apprehend the fleeing defendant. Officer Ford, once again, refused.

## 24.

Lt. Laque became very angry again. He threw papers off his desk, shouted, belittled, and physically slammed his fist on the desk. Officer Ford feared for her safety. Her body trembled uncontrollably during the outburst. Eventually, she found the courage to ask Lt. Laque if she could go home for the rest of the day. Notwithstanding Officer Ford's refusal to sign the form, upon information and belief, Lt. Laque submitted a falsified form to Internal Affairs.

## 25.

Officer Ford completed a grievance form against Lt. Laque regarding the most recent incident occurring in his office. Officer Ford took her grievance directly to Laque's supervisor, Capt. Dale Thomas, who immediately attempted to dissuade Officer Ford from filing her grievance.

## 26.

On or about August 30, 2017, Officer Ford received a correspondence from Internal Affairs. The correspondence informed her of an ongoing investigation into her alleged unsatisfactory conduct involving the aforementioned courtroom incident. Upon information and belief, at no time was Officer Ford's male colleague, Officer Ca'bean, the subject of an Internal Affairs investigation.

4

27.

In response to the Internal Affairs correspondence, Officer Ford contacted witnesses who were present during the courtroom incident. Ford also spoke with the attorney that represented the defendant who fled the courtroom and the defendant himself. Officer Ford was told that several of her male colleagues were joking about trying to get her fired.

28.

A week after she received the Internal Investigation letter, Ford was interviewed by Sergeant Montgomery and Sgt[.] Michael [Babineaux]. After the interview, on or about September 13, 2017, Officer Ford's employment was terminated.

On December 5, 2019, the Defendants filed an answer to the petition, which included general denials and affirmative defenses.

On July 1, 2022, the Defendants filed a motion for summary judgment, asserting that Plaintiff "cannot establish a prima facie case for disparate treatment or retaliatory termination" and that "[e]ven if she could make a prima facie case, the case should still be dismissed because there was a legitimate, nondiscriminatory and nonretaliatory reason for her termination." In support of their motion, the Defendants attached the following four exhibits: Exhibit 1 -- portions of the deposition of Lieutenant Frederick [Freddie] Laque, Jr.; Exhibit 2 -- portions of the deposition of Plaintiff, with the following exhibits as attached to that deposition: (Exhibit A) May 25, 2017, grievance form; (Exhibit B) June 25, 2017, correspondence; (Exhibit C) June 15, 2017, correspondence; (Exhibit D) June 22, 2017, correspondence; (Exhibit E) July 14, 2017, correspondence; (Exhibit F) August 24, 2017, grievance form; (Exhibit G) August 25, 2017, grievance form; (Exhibit H) August 30, 2017, notice of Internal Affairs investigation; (Exhibit I) September 5, 2017, statement of inmate Tony Ben; (Exhibit J) September 5, 2017, statement of attorney Irvin Celestine; (Exhibit K)

September 13, 2017, notice of termination of Gail Ford; Exhibit 3 -- portions of the deposition of Major Jules Broussard; and Exhibit 4 -- portions of the deposition of Staff Sergeant Alex Montgomery, with portions of Exhibit 2 as attached to that deposition.

On October 3, 2022, Plaintiff filed an opposition to the motion for summary judgment wherein she consented to "the dismissal of all claims with [the] exception of her Title VII Retaliation Claim." Additionally, Plaintiff alleged that the adverse employment action was not her termination but "when Defendants, who were well aware of [her] protected activity, escalated a matter that was initially the subject of a written warning to an Internal Affairs Complaint and Investigation." Plaintiff argued that she has demonstrated a prima facie claim for retaliation under Title VII and attached the following exhibits in support of her opposition: (1) her September 30, 2022 sworn affidavit along with attachments evidencing her grievances; (2) her March 16, 2021 deposition; and (3) the March 17, 2021 deposition of Major Jules Broussard.

On October 10, 2022, the Defendants filed a reply in support of their motion for summary judgment arguing that the court "should not consider [Plaintiff's] new argument that the [Internal Affairs] investigation is actually the retaliatory adverse employment action because she did not plead that in her Petition[,]" but that even if the court considers this new argument, her retaliation claim should be dismissed "because there was a legitimate, nonretaliatory reason for the investigation, and [Plaintiff] presented no evidence that the reason was pretextual nor that the true reason was to retaliate against her."

Following a hearing, the trial court issued a judgment on October 18, 2022 granting the Defendants' motion for summary judgment. In her reasons for judgment, the trial judge stated as follows:

> After review and consideration of the evidence, this Court finds that Ms. Ford was terminated for a legitimate non-discriminatory basis. Staff Sergeant Alex Montgomery, who was the investigator in the Internal Affairs investigation, testified in his deposition, that the matter involving the courtroom incident wherein Ms. Ford refused to sign the conference sheet was the matter being referred to or requested by Ms. Ford to be referred to Internal Affairs. Sergeant Montgomery also agreed that the reason Ms. Ford was terminated was based upon these violations, including her interference with and [sic] Internal Affairs investigation. As such, the burden now shifts to the plaintiff to prove that her employer's reason were [sic] merely pretexutal [sic] and the true reason for the action was discriminatory. Based on the evidence submitted, plaintiff has not carried her burden to show this. Both Plaintiff and Deputy Cabe'an, her male counterpart, were given a Conference Sheet (written warning) and the opportunity to sign. Ms. Ford refused to sign the conference sheet and as such an Internal Affairs investigation was conducted; which recommended Ms. Fords termination. Therefore, this Court grants Defendants[,] Mark Garber, in his official capacity as the Duly Elected Sheriff of Lafayette Parish, and Freddie Laque's, in is official capacity as Lieutenant Sheriff of Lafayette Parish, Motion for Summary Judgment finding that Plaintiff cannot establish a prima facie case for disparate treatment or retaliatory termination.

Plaintiff now appeals alleging the following sole assignment of error: "The Trial Court erred when it applied the law governing Title VII Discrimination Claims when granting summary judgment in favor of Defendants-Appellees as to Plaintiff-Appellant's retaliation claim." It is worth noting at this time that this court reviews a judgment, not the reasons for judgment. *See Bellard v. American Cent. Ins. Co.*, 07-1335 (La. 4/18/08), 980 So.2d 654; La.Code Civ.P. arts. 1918, 2082, and 2083. "The written reasons for judgment are merely an explication of the Trial Court's determinations. They do not alter, amend, or affect the final judgment being appealed[.]" *State in Int. of Mason*, 356 So.2d 530, 532 (La.App. 1 Cir. 1977). In this case, the October 18, 2022 judgment granted "Defendants[']

Motion for Summary Judgment dismissing Plaintiff's claims for disparate treatment or retaliatory termination against the Defendants."

**STANDARD OF REVIEW:**

The summary judgment procedure is expressly favored in the law and "is designed to secure the just, speedy, and inexpensive determination of every action[.]" La.Code Civ.P. art. 966(A)(2). "Appellate courts review summary judgments *de novo* under the same criteria that govern the district court's consideration of whether summary judgment is appropriate." *Duncan v. U.S.A.A. Ins. Co.*, 06-363, p. 3 (La. 11/29/06), 950 So.2d 544, 547. Under this standard of review, this court must determine whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. *Id.* "A fact is 'material' when its existence or nonexistence may be essential to [a] plaintiff's cause of action under the applicable theory of recovery." *Smith v. Our Lady of the Lake Hosp., Inc.,* 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." *Id.* (alteration in original) (quoting *S. La. Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3 Cir. 1991), *writs denied*, 596 So.2d 211 (La.1992)).

The burden of proof on a motion for summary judgment rests with the mover: here, the Defendants. La.Code Civ.P. art. 966(D)(1). In this matter, the Defendants will not bear the burden of proof at trial; the burden of proof rests with the Plaintiff. Thus, once the Defendants properly support their motion for summary judgment, then under La.Code Civ.P. art. 966(D)(1), they need only point out to the trial court the absence of factual support for one or more elements essential for Plaintiff to establish a Title VII retaliation claim.

8

Thereafter, the burden shifts to the Plaintiff "to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the [Defendants are] not entitled to judgment as a matter of law." La.Code Civ.P. art. 966(D)(1). The Plaintiff "may not rest on the mere allegations or denials of [her] pleading, but [her] response . . . must set forth specific facts showing that there is a genuine issue for trial. If [she] does not so respond, summary judgment, if appropriate, shall be rendered against [her]." La.Code Civ.P. art. 967(B).

**DISCUSSION:**

Plaintiff contends she is the victim of sex discrimination and retaliation for protesting the discrimination allegedly perpetrated by her supervisors at LPSO. Specifically, Plaintiff asserts that she was one of two bailiffs that were involved in an August 22, 2017 inmate incident and, despite both bailiffs being admonished by Captain Dale Thomas for their job performance and receiving a written warning for their job performance in the form of a conference sheet, she was the only bailiff "now the subject of an Internal Affairs Investigation and subject to termination[.]" Plaintiff alleges that "[t]here is absolutely no evidence in the record that Defendants have ever subjected a male bailiff to the same kind of treatment, i.e., escalating a matter that was initially the subject of a written warning to an Internal Affairs Complaint and Investigation." Plaintiff argues that even though she abandoned her sex-based discrimination claims in response to the Defendants' motion for summary judgment, "the [t]rial [c]ourt failed to properly evaluate [her] retaliation claim" and erred when it "applied the law governing Title VII discrimination claims."

Under Louisiana law, it is unlawful for an employer "to intentionally discriminate against any individual with respect to compensation, or terms,

9

conditions, or privileges of employment, because of the individual's race, color, religion, sex, national origin, or natural, protective, or cultural hairstyle." La.R.S. 23:332(A)(1). Discrimination is also unlawful under federal law pursuant to Title VII of the Civil Rights Act of 1964, which forbids an employer from discriminating against "any individual" based upon that individual's "race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII also contains an antiretaliation provision that prohibits "an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

For Plaintiff to establish a prima facie case for retaliation, she must prove, "by a preponderance of the evidence, that: '(1) she engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action.'" *Washington v. Bd. of Supervisors for Univ. of La. Sys.,* 19-578, p. 4 (La.App. 3 Cir. 3/11/20), 297 So.3d 69, 72, *writ denied*, 20-807 (La. 10/14/20), 302 So.3d 1120 (quoting *Brooks v. S. Univ. & Agric. & Mech. Coll.*, 03-231, pp. 48-49 (La.App. 4 Cir. 7/4/14), 877 So.2d 1194, 1221, *writ denied,* 04-2246 (La. 11/19/04), 888 So.2d 208.) As stated in *Brooks*, 877 So.2d at 1221 (internal citation omitted):

> Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the defendant introduces evidence, which, if true, would permit the conclusion that the adverse action was non-discriminatory, the plaintiff/employee assumes the burden of establishing that the reason or reasons given were a pretext. To satisfy this burden, the plaintiff must show that "but for" the protected activity, the adverse employment action would not have occurred.

10

After reviewing and accepting all of the allegations in Plaintiff's petition as true and applying the legal principles set forth above, we find her petition sets forth sufficient facts to state a cause of action for retaliation. Therefore, we must now determine whether Plaintiff proved, by a preponderance of evidence, a causal link between an adverse employment action and a protected activity.

In Plaintiff's statement of facts in dispute, she admits that "[o]n August 22[,] 2017, [she] and Deputy Devlin Cabe'an (who is male) were assigned as bailiffs to Judge Rubin's courtroom at the Lafayette Parish Courthouse" and that "[d]uring court proceedings, Judge Rubin ordered that the bailiffs restrain . . . Tony Ben to the courtroom, but [Tony Ben] absconded from the courtroom." Plaintiff stated in her opposition to the Defendants' motion for summary judgment that "[a]s a result of the [August 22, 2017] incident, Lt. Laque served both [Plaintiff] and Cabe'an with identical written warnings or 'conference sheets' for alleged poor job performance involving the handling of Tony Ben[,]" but that she "did not agree with Lt. Laque's characterization of the events involving Tony Ben" and "refused to sign the conference sheet."

In Sergeant Alex Montegomery's June 22, 2021 deposition, he testified that he was an employer of the LPSO from 1984 through 2019 and explained the various ways in which an officer is disciplined within the sheriff's office. Specifically, Sergeant Montegomery testified as follows:

> You can have a -- basically a written warning, Conference Sheet, with no suspension or anything. You can have a suspension, where you lose some compensation, and you also lose time. You have situations where you can lose privileges, such as your off-duty capability of working off-duty security. You have transfers, demotions, and you also have [p]ost-counseling type of discipline, where you may see a particular training officer for a particular training, bad habits you may have, or you may see a psychiatrist for anger management.

11

. . . .

After that the person is notified, they sign that they've received the warning, or the notification of the infraction, and either it's placed in your personnel file, and some of the infractions, based on who they are or what they are, like your Conference Sheet, can be taken out of your file within one year.

Sergeant Montgomery continued to testify regarding Plaintiff's August 22, 2017 courtroom infraction and the Internal Affairs investigation, as follows:

Q. Okay. And so it's your testimony that the matter involving a courtroom incident wherein Ms. Ford refused to sign a -- I think you called a written notification, i.e., Conference Sheet, that's the matter that was referred to -- or requested by Ms. Ford to be referred to Internal Affairs?

A. That's correct.

Q. How did you get involved in this investigation?

A. I was the investigator in Internal Affairs. Captain Todd Credeur was the captain of Internal Affairs. He assigned the case to me.

Q. Describe for me what steps did you take in investigating the matter. What was the first thing you did -- and I know you – I'm not asking, you know, every little detail, but just the major steps that you engaged in while investigating this matter?

. . . .

A. That particular day, the Conference Sheets were developed. Deputy Ford, Deputy Cabe'ne, both of them were given their Conference Sheets by the Lieutenant. Cabe'ne signed his. Ford refused to sign hers, and I think at that point she decided she wanted to sign a grievance, I think, from past history maybe dealing with her supervisor.

And in that same meeting there, she advised Lieutenant Laque that she wanted to have a meeting with the Judge. And she was told by the lieutenant, "That can't happen until we get approval from the Captain, Captain Thomas. Let me speak with him first, and then I'll get back with you." And from what I remember was [sic] he proceeded to go to Captain Thomas and inform him of the refusal to sign the Conference Sheets and the request of a grievance, and during that time Deputy Ford proceeded to contact Judge Rubin's law clerk and proceeded to

12

set up a meeting with Judge Rubin after being told to pause until she got approval -- or Lieutenant Laque got approval.

. . . .

And I think she went home that day, and I believe that is the point when she was requesting a grievance and also Internal Affairs to possibly take over the investigation versus Lieutenant Laque and Captain Thomas.

. . . .

At that point there, the supervisors felt that they would give her what she wanted, and they gave -- they contacted Captain Credeur with Internal Affairs and asked Internal Affairs to go ahead and take it over at her request. So we took it over, and she was officially served to let her know that Internal Affairs was handling the case.

Sergeant Montgomery and Sergeant Mike Babineaux gathered the facts pertaining to the allegations of Plaintiff's unsatisfactory performance and insubordination. While conducting the investigation, Sergeants Montgomery and Babineaux realized that not only was Plaintiff interfering with their investigation but she was being untruthful.

Following the Internal Affairs investigation, the review personnel, which consisted of Major Art Lebretton, Major Dondi Hardin, and Lieutenant Toby Landry, sustained all charges brought against Plaintiff for her unsatisfactory work performance, false statements, insubordination, and interferences with the investigation. On September 13, 2017, Captain Todd Credeur notified Plaintiff that because all of the allegations against her were sustained, her employment with LPSO was terminated. Sergeant Montgomery stated in his deposition that it is his "understanding that the reason [Plaintiff] was terminated was based upon these violations, including her interference with the [Internal Affairs] investigation."

13

After reviewing the evidence submitted on the motion for summary judgment, we find there is no causal link between Plaintiff's protected activity (i.e. filing grievances involving her discriminatory mistreatments by her supervisors and fellow male officers) and her alleged adverse employment action (i.e. the Internal Affairs investigation). As previously stated, Plaintiff stated in her opposition that she "did not agree with Lt. Laque's characterization of the events involving Tony Ben" and "refused to sign the conference sheet." It was Plaintiff's decision to not accept Lieutenant Laque's warning (conference sheet), which triggered the Internal Affairs investigation. Further, an argument can be made that the Internal Affairs investigation was proper and in the best interest of Plaintiff considering the fact that she continued, even after receiving the warning, to file grievances against her supervisors, Lieutenant Laque and Captain Thomas. Thus, even if Plaintiff could establish a prima facie case for a retaliation claim, we agree with the Defendants that her claim should be dismissed because "there was a legitimate, nonretaliatory reason for the [Internal Affairs] investigation, and [Plaintiff] presented no evidence that the reason was merely a pretext for retaliation." Accordingly, based on the record, we find Plaintiff failed to show a causal link between a protected activity and an adverse employment action.

For these reasons, we affirm the October 18, 2022 trial court judgment that granted summary judgment in favor of the Defendants, Mark Garber, in his official capacity as the Sheriff of Lafayette Parish, and Freddie Laque, in his official capacity as Lieutenant Sheriff of Lafayette Parish. All costs of this appeal are assessed against Plaintiff, Gail Ford.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.